IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

ROSALINDA IBARRA, as the Special )
Administratrix of the Estate of JORGE )
MARTINEZ, deceased, )
 )
      Plaintiff, )
 )
v. ) Case No. 20-CV-598-TCK-SH
 )
CHEYENNE LEE, and THE )
BOARD OF COUNTY )
COMMISSIONERS OF )
ROGERS COUNTY, )
 )
      Defendants. )

**OPINION AND ORDER**

Before the Court are the Defendants Cheyenne Lee's and the Board of County Commissioners of Rogers County's Motions for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56. (Docs. 50, 51). Plaintiff filed Responses (Docs. 57, 58), and Defendants filed Replies. (Docs.61, 62).

Plaintiff brings this action, pursuant to 42 U.S.C. §1983. Plaintiff alleges that on the afternoon of March 13, 2020, Deputy Cheyenne Lee ("Deputy Lee" or "Lee") entered the home of Plaintiff's decedent, Jorge Martinez ("Martinez"), "without warrant, consent, or justification, under the pretext of performing a welfare check on Martinez's children." Complaint ¶ 17. Plaintiff claims that after illegally entering her home, Deputy Lee confronted Martinez and when Martinez objected to Deputy Lee's presence, Deputy Lee proceeded to arrest Martinez. Deputy Lee then allegedly took Martinez to the ground and shot him resulting in Martinez's death.

Defendants, however, allege the following: Deputy Lee was faced with a life-threatening situation when he shot Martinez during an intense and violent struggle. Per the directions of a

Rogers County Judge, Lee was on Martinez's premises (with the consent of his mother) to serve a protective order, due to allegations of domestic violence made by Sara Chapa. ("Chapa"). When Lee approached Martinez with the protective order, Martinez immediately cursed and threatened Deputy Lee and became aggressive and confrontational. Lee first attempted to calm Martinez and then attempted to arrest Martinez for making threats of violence. But Martinez actively resisted, and engaged in hostile and aggressive fighting with Lee. At one point, Lee reasonably believed Martinez was attempting to get a gun during the struggle and, at another point, Martinez's mother prevented Lee from obtaining access to his radio to call for help. Ultimately, Martinez escaped Lee's grasp, and began assaulting and battering Lee in the back room of the house, causing Lee to black-out and urinate on himself. During the struggle and in fear for his life, Lee managed to unholster his gun and fired a single shot striking Martinez in the chest.

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Federal Rule of Civil Procedure 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Zamora v. Elite Logistics, Inc.,* 449 F.3d 1106, 1112 (10th Cir. 2006); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine

2

issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler*, 144 F.3d at 670.

## II. BACKGROUND

Prior to March of 2020, Martinez had an extensive violent criminal history and spent numerous years incarcerated (as a minor and as an adult), including the rape of Chapa when she was a minor, and other violent crimes. [1] (Exhibit 1, Depo. of Chapa at 96-97; Exhibit 2, Petition for Protective Order at 2). Following his release from prison, Martinez began a tumultuous relationship with Chapa involving alcohol, drugs, threats, violence, and caused her to seek protection at a local women's shelter. (Exhibit 1 at 63-67; Exhibit 3, Depo. of M. Martinez at 18:13-22).

According to Chapa, on March 10, 2020, Martinez and Chapa left together on a trip and, while returning, Chapa believed Martinez had been drinking and had used drugs. While driving, he threatened her and showed her a gun, causing her to get scared. He said to her: "Don't be scared" and "Look what I got for you" and "Everything's going to be all right, I'm going to fix it." (Exhibit 1 at 68-71). At a gas station, Chapa borrowed a phone and called her parents to come and get her; she also called Martinez from the bathroom of the gas station and told him she wanted to leave

---

[1] Martinez also had a violent episode with Plaintiff Rosalinda Ibarra (his sister), and her husband and daughter. Martinez was charged with assault and battery with a dangerous weapon for pulling a knife on Rosalinda and threatening her with bodily harm. (Exhibit 4, Depo. of Ibarra at 52-55). Martinez called Rosalinda and told her he was going to kill her, her husband, and her children. (*Id.* at 55:21-25; 56:12-21). Martinez pled guilty to this charge. (*Id.* at 57:16-19). On a separate occasion, he assaulted Plaintiff's husband and daughter. (*Id.* at 60-67).

3

him. (Exhibit 1 at 70-74). The next day, Chapa called Martinez and requested that he give her the children, [2] and he said, "No. Good luck" and hung up the phone. (Exhibit 1 at 75).

Deputy Lee's involvement with Chapa and Martinez began on March 12, 2020, with a call from Chapa asking for a deputy to check on the welfare of her two children. Chapa told Lee what had occurred between her and Martinez the previous day. Lee attempted to check on Chapa's children that day but was unsuccessful.

On March 13, 2020, Lee was advised that Chapa had obtained a Protective Order for herself and her children against Martinez. The Oklahoma Department of Human Services and a local Rogers County District Court Judge were contacted. Lee was provided a copy of the Protective Order and was directed to serve it on Martinez and facilitate taking the children into protective custody. Lee alleges that when he attempted to do so, Martinez became aggressive and violent, and Martinez's actions resulted in Lee having to use deadly force to protect himself from serious bodily harm or death.

The uncontroverted record establishes the following:[3]

1. On March 12, 2020, Chapa called the Rogers County Sheriff Department to obtain a welfare check on her children. (Exhibit 1, Depo. of Chapa at 81; Exhibit 3, Depo. of Maria Martinez 26:1-5; Exhibit 4, Depo. of R. Ibarra at 86:10-12).

---

[2] Three (3) children were ultimately born of the relationship between Martinez and Chapa, but only two were born at the time of Martinez's death. (Exhibit 1, Depo. of Chapa at 12; 77-78 [discussing choking incident following ultrasound on March 9, 2020]).

[3] Although Plaintiff provided a response to all fifty-nine (59) of Defendants' Unidsputed Material Facts, many of those responses are contrary to the requirements of Fed.R.Civ.P. 56 and Local Rule 56.1(c). Specifically, Local Rule 56.1(c) provides that "[e]ach fact in dispute shall be numbered, shall refer particularly to those portions of the record upon which the opposing party relies . . . ". In the instant case, not only are there instances in which Plaintiff disputes facts in the record without any citation to the record, but Plaintiff also makes statements that are not supported by the record cited.

4

2. On March 12, 2020, the welfare check was routed to Deputy Cheyenne Lee, who went to the Martinez residence and to the residence of Martinez's sister (Rosalinda Ibarra), but Lee was unable to locate Martinez or the children. (Exhibit 5, D (Exhibit 5, Depo. of I. Mitchell at 42-45; Exhibit 3, Depo. of Maria Martinez at 23:10-21; Exhibit 6, Depo. of Lee at 30:1-14; 36:6- 15; Exhibit 4, Depo. of R. Ibarra at 83-85).

3. On that date, Lee talked with Maria Martinez (Martinez's sister) who was also living at the Martinez's residence, but she denied knowledge of the location of the children and gave Lee incorrect information about how to contact her mother (Isidra Mitchell). (Exhibit 3, Depo. of Maria Martinez at 23-25; 29:15-25).

4. Following her interaction with Lee, Maria Martinez let Martinez know that the Sheriff's Office was looking for his children. (Exhibit 3, Depo of M. Martinez at 24:19-25; 25:1-2).

5. Unbeknownst to Lee or Rogers County or Chapa, Martinez had rented a motel room with his mother and two children and left his sister Maria Martinez by herself at their house. (Exhibit 5, Depo. of I. Mitchell at 44-47; Exhibit 3, Depo. of Maria Martinez at 20-21).

6. On March 13, 2020, Chapa sought and obtained a protective order on behalf of herself and her children from the District Court of Tillman County. (Exhibit 2, Petition for Protective Order; Exhibit 7, Emergency Order of Protection; Exhibit 6, Depo. of Lee at 37:8-21).

7. On the same date, the Rogers County Sheriff Department was in contact with Rogers County District Judge Pazzo, who instructed Rogers County Sheriff's Department to serve the Protective Order on Martinez and take custody of the children; Judge Pazzo further indicated he would intervene if the DHS refused to assist in taking custody of the children. (Exhibit 8, Depo. of Sappington at 12-26; Exhibit 9, Depo. of Walton at 44-46; 127:8-15).

8. On March 13, 2020, Deputy Lee was assigned the job of serving the protective order on Martinez and taking protective custody of the two children. (Exhibit 6, Depo. of Lee at 38:1-5; Exhibit 8, Depo. of J. Sappington at 26:2-11).[4]

9. Deputy Lee, who had talked with Chapa, was aware that Martinez had physically injured and been abusive toward Chapa. (Exhibit 6, Depo. of Lee at 46:2-11; 47:13-14; Exhibit 10, Depo. of L. Eller at 14:16-21).

10. On March 13, 2020, Martinez, his mother (Isidra Mitchell), his sister (Maria Martinez) and the two young children were located at the house. (Exhibit 3 at 27; Exhibit 5 at 49-50).

11. Once he confirmed that Martinez and the children were there, Lee retrieved the protective order from his car and radioed for back-up assistance. (Exhibit 6, Depo. of Lee at 59:17-22; 61:20-24; Exhibit 10, Depo. of L. Eller at 18-22; Exhibit 13, Depo. of Nelson at 6-7; 11:4-20; 45:15-25; 46:1-11).

12. Maria Martinez and Isidra Mitchell allowed Lee to enter the house to serve the protective order. (Exhibit 6 at 64:1; Exhibit 5, Depo. of I. Mitchell at 100:18-20; 102:4-9; Exhibit 11, Statement of M. Martinez at 19:6-9; Exhibit 12, Depo. of J. Noble at 35:21-25; 36:1-3; Exhibit 14, OSBI Interview of I. Mitchell; Exhibit 15, OSBI Interview of M. Martinez).

13. Mitchell believed that Martinez would wake up cussing and throwing a fit and be angry and in a bad mood. (Exhibit 3, Depo. of M. Martinez at 33-34; Exhibit 5, Depo. of I. Mitchell at 56:15-18; 73:21-25; 74:16; 74-75). Mitchell warned Lee that Martinez might be upset and cussing but gave no warning that he would be violent. (Exhibit 5 at 73-75; Exhibit 11 at 18:1-6).

---

[4] The Petition for Protective Order was not provided to the Rogers County Sheriff's Office nor to Deputy Lee. Only the Protective Order itself was provided to Rogers County.

14. Before Lee entered, Mitchell had attempted to wake Martinez up on two occasions, and he said "no, F that. I'm not going to let no strangers see my kids." (Exhibit 5, Depo. of I. Mitchell at 55:5-6; 73:7-11).

15. After Lee entered, Mitchell led Lee through the house and down the hallway to the bedroom where Martinez was located. (Exhibit 6 at 64:1-6; Exhibit 5 at 56-57; Exhibit 14-15).

16. At that time, Mitchell attempted to serve the protective order on Martinez, but Martinez began jumping up and down; cursing; getting wild; fists clinched; and telling the deputy to get out of the house, or to "get the F out of the house" or "what the F are you doing in my house, also pointing at his face, what the F are you doing in my house, get out of my house" or "Fuck [you] and fuck [your] papers." (Exhibit 3, Depo. of M. Martinez at 34; [5] Exhibit 5, Depo. of I. Mitchell at 57:1-9; 75:5-9 [agreeing Martinez jumped out of bed yelling and cussing]; Exhibit 6, Depo. of Lee at 67:14-20; 68:1-12; 75:6-13; 77:3-4; Exhibit 11, Statement of M. Martinez at 21:17-18 ["He was calling the officer bitch and all types of names. Just yelling at him."]; Exhibit 14; Exhibit 15).

17. Martinez was moving his hands and arms around while yelling at the deputy. (Exhibit 3, Depo. of M. Martinez at 36-37; Exhibit 6, Depo. of Lee at 73:14-22; 75:7-8 ["He was in an aggressive fighting stance from the moment he jumped out of the bed, sir."]; 75:10-12; Exhibit 11, Statement of M. Martinez at 22:15-25; Exhibit 14).

18. Lee tried to de-escalate the situation. (Exhibit 6 at 73-74; 78:25; 79:1-3; Exhibit 14; 15).

---

[5] Martinez had been drinking alcohol that day. (Exhibit 5, Depo. of I. Mitchell at 50:1-8). Following his death, his blood alcohol content was determined to be .13. (Exhibit 17, Depo. of Lanter at 31-32; 38-39).

19. Lee told Martinez he was under arrest for making threats and Lee then attempted to grab Martinez's left upper arm. (Exhibit 6, Depo of Lee at 71:4-24 ["That he would beat her ass; he would beat my ass; and then he threatened to kill me."]; 73:14-22; 75:15-21).

20. Martinez resisted arrest, pulled away, lunged back into the nearby bedroom, and appeared to be reaching toward a nightstand, at which time Lee struck him; tried to place him under arrest; and told him he was under arrest multiple times. (Exhibit 6, Depo of Lee at 76:9- 16; 77-78; 83:19-25; Exhibit 5, Depo of I. Mitchell at 57:14-25 [agreeing Lee told Martinez he was under arrest multiple times, and that Martinez was resisting arrest]).

21. Lee feared Martinez was reaching for a weapon as he lunged for the nightstand. (Exhibit 6, Depo of Lee at 78:1-3; 79:5-25; 80:1-8).

22. They physically fought each other for several minutes thereafter as Martinez continued to resist arrest. (Exhibit 6 at 82:7-14; Exhibit 5, Depo. of I. Mitchell at 58:7-22).

23. During this time, Martinez was striking Lee, punching him in the lower abdomen, groin, vest, head area. (Exhibit 6 at 86:5-11; 93:12-15; Exhibit 11 at 29:10-14).

24. During Lee's attempt to arrest Martinez, Martinez's mother was touching Lee and "kept tapping his shoulder" (or was "on top of" Lee) and telling him he "said he wasn't going to arrest" Martinez. (Exhibit 6, Depo. of Lee at 84:4-18; 95:1-9; Exhibit 5, Depo. of I. Mitchell at 68:5-14 ["I kept tapping his shoulder and telling him he said he wasn't going to arrest him"]; Exhibit 11, Statement of M. Martinez at 25:17-25; 26:8-10; Exhibit 15).

25. During the physical confrontation between Lee and Martinez, Lee's radio became dislodged, and Lee asked Isidra Mitchell to give him his radio several times, and she refused and kicked it away from him causing Lee to become more concerned. (Exhibit 6, 96:5-10; 144-145; Exhibit 5 at 102:18-22 ["A: I remember seeing it fall down, and then I remember that he pointed

at it and told me to give it to him. Q: And is it true you did not give it to him? A: That is a true statement, sir."]; 103-104; 58:14-18 ["Cheyenne Lee was on top of him, yelling and screaming at me to give him his radio. At first I said no . . ."]).

26. Instead of giving Deputy Lee his radio so Lee could seek help, Isidra Mitchell attempted (unsuccessfully) to record the encounter with her cell phone. (Exhibit 5 at 83:24-25; 57:25; 58:1-10; Exhibit 6 at 80:6-8; 94:18-19; 96:15-18; 142:14-15; Exhibit 14).

27. Lee also asked Maria Martinez for his radio, but she also refused and picked up the radio and took it into the living room. (Exhibit 6 at 96:14-15; Exhibit 3 at 40:21-25; 41:1-4 ["Q: And you picked up the radio and took it into the living room; in other words, took it away from the deputy, right? A: Yes, sir."]; Exhibit 15).

28. Lee was able to get a single handcuff onto only one of Martinez's wrists, and tightened the cuff as a pain compliance technique, but this did not result in any compliance from Martinez. (Exhibit 6 at 85:1-12; 89:7-14; 90:17-22; Exhibit 5 at 79-80, 82; Exhibit 14).

29. Martinez was able to get away from Lee's grip while Lee was on his knees, and Martinez began delivering punches to Lee (also including using the handcuff as a weapon leaving a mark on Lee's forehead); threatened to kill Lee; and ultimately caused Lee to urinate on himself and begin to black-out. (Exhibit 6, Depo. of Lee at 93:10-21; 99-101; 108:1-14; 99:10-14; 108:6-15; 115:8-11; 117:4-20; 118-120; 123; 124-125; Exhibit 16, Depo. of Walker at 21:14-25).

30. Because of the threat to his life and the ongoing physical attack, Lee unholstered his gun and shot Martinez in the chest while Martinez was standing over him in a crouched position. (Exhibit 6, Depo. of Lee at 103-104; 108; 112-113; 140:4-5; 151:18-23).

31. At the time Lee fired the shot, he was on his knees, facing south, with his back to the north wall/closet; Martinez was on his feet, facing Lee, i.e., facing north with his back to the south

wall. (Exhibit 6, Depo of Lee at 115:5-11; 118:8-12; 118-121; 149-150; Exhibit 21, Noedel Expert Report, Figure 10).

32. Lee fired the shot from north to south. (Exhibit 6, Depo. of Lee at 149-150).

33. The bullet that struck and passed through Martinez was found by Plaintiff in the south wall. (Exhibit 4, Depo. of R. Ibarra at 98-103; Exhibit 22, Letter from Attorney Underwood).

34. The bullet that struck and passed through Martinez continued to travel south and struck and entered the south wall approximately 17.5 inches up from the floor and approximately 15.5 inches east of the west corner. (Exhibit 21, Noedel Expert Report, pg. 4 of 20 and Figure 5).

35. It has been scientifically and mathematically determined that the exit wound from which the bullet left Martinez's back had to be between 21.7 inches to 25.1 inches up from the floor, depending on how far Martinez was from the south wall when the shot was fired. (Exhibit 23, Autopsy Report pg. 1, 3; Exhibit 24, Autopsy Diagram; Exhibit 21, Noedel Expert Report, pg. 5 of 20; 8 of 20; Table 1; Figure 10).

36. Martinez could not have been laying on the floor when shot, as alleged by Plaintiff. (Exhibit 21, Noedel Report; Exhibit 17, Deposition of Lanter at 28:13-16; 49-50).

37. After obtaining his radio back, Lee immediately sought additional help, ambulance, and fire truck, who arrived within minutes. (Exhibit 6, Depo. of Lee at 127-128).

38. The gun shot was not survivable with immediate medical care; Martinez lost consciousness within seconds and died within minutes. (Exhibit 17, Depo. of Dr. Lanter at 45-46).

39. The District Attorney of Rogers County reviewed the use of force in this case and found the use of force was justified and that any reasonable officer would have concluded that Martinez posed a real and significant threat to Lee's safety. (Exhibit 18, Letter of DA Matthew Ballard at 4; Exhibit 20, Affidavit of Scott Walton).

40. In addition, RCSO Use of Force Review Board received, read, and relied upon the OSBI's investigative report and found that Deputy Lee acted reasonably and in accordance with RCSO policies and procedures. (Exhibit 19, RCSO Use of Force Review Board).

### III. ANALYSIS

#### A. QUALIFIED IMMUNITY

As a general rule, when government officials are sued for performing discretionary functions, courts recognize the affirmative defense of qualified immunity, which protects "all but the plainly incompetent or those who knowingly violate the law," shielding them from civil liability. See *Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); see also *City of Tahlequah v. Bond*, 142 S. Ct. 9, 10 (2021). Once a defendant raises qualified immunity, "the plaintiff initially bears a heavy two-part burden." See *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995) (citing *Hannula v. City of Lakewood*, 907 F.2d 129, 130-31 (10th Cir. 1990)). First, the plaintiff must demonstrate that the defendant's actions violated a constitutional right. Then, the plaintiff must show that the constitutional rights the defendant allegedly violated were clearly established at the time of the conduct at issue. *Id*. If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant qualified immunity. See *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

**1. Unreasonable Detention and Arrest**

Plaintiff's First Claim is for Unreasonable Detention and Arrest in violation of the Fourth Amendment. (Doc. 2, pp. 10-11). Plaintiff claims that Deputy Lee unlawfully arrested Martinez without probable cause and without justification, and that the scope and manner of his detention and arrest were unreasonable. (*Id*. at ¶39). "When a warrantless arrest is the subject of a § 1983 action, the defendant is entitled to qualified immunity if a reasonable officer could have believed

that probable cause existed to arrest or detain the plaintiff." *Stearns v. Clarkson*, 615 F.3d 1278, 1283 (10th Cir. 2010) (quoting *York v. City of Las Cruces,* 523 F.3d 1205, 1210 (10th Cir.2008)). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *Morris v. Noe*, 672 F.3d 1185, 1192 (10th Cir. 2012).

In Oklahoma, state law prohibits a person from threatening a violent act. 21 O.S. § 1378(B); Oklahoma Uniform Jury Instruction (Criminal) 2-24; 21 O.S. §649 (crime to "assault" deputy sheriff). In this case, Lee had probable cause to arrest Martinez after he refused to accept service of the protective order, used curse words directed at Deputy Lee, and threatened to "beat" Deputy Lee's "ass." For that reason, Plaintiff's Unreasonable Arrest/Detention claim fails as a matter of law because a reasonable conclusion to be drawn from the facts known to Lee at the time of his arrest was that Martinez was threatening a violent act and/or assaulting Lee.

Second, Martinez engaged in conduct that amounted to Obstructing an Officer.[6] 21 O.S. §540 ("Every person who willfully delays or obstructs any public officer in the discharge or attempt to discharge any duty of his or her office, is guilty of a misdemeanor."); *Trent v. State*, 777 P.2d 401, 402 (Okla. Crim. App. 1989) ("[W]ords alone may suffice to support a conviction for Obstructing an Officer."); *Marsh v. State*, 761 P.2d 915 (Okla. Crim. App. 1988) (finding truck driver's false statement to police about who backed truck onto homicide victim willfully delayed or obstructed police officer in discharge of his duty). In this instance, Deputy Lee was attempting

---

[6] In his deposition, Deputy Lee did not reference this basis for his arrest of Martinez, but Lee's subjective reason or belief for making the arrest is irrelevant to the Fourth Amendment analysis. The question is whether any objective probable cause existed. See *Scott v. U.S.*, 436 U.S. 128 (1978); *Whren v. U.S.*, 517 U.S. 806 (1996); *Devenpeck v. Alford*, 543 U.S. 146 (2004); *Apodaca v. City of Albuquerque*, 443 F.3d 1286, 1289 (10th Cir. 2006).

to serve a protective order pursuant to the directives of Judge Pazzo and the Tillman County District Court, and yet Martinez slapped the papers out of his hands; started jumping around with his arms in the air; was cussing; threatened Deputy Lee; and prevented Lee from serving the papers. (Exhibit 6, Depo. of Lee at 77).Therefore, Deputy Lee had probable cause to arrest Martinez for Obstructing an Officer.[7]

Third, Martinez was in violation of the protective order issued by a court in Tillman County. Deputy Lee served the protective order on Martinez, even though Martinez pushed it away and did not accept it. In Oklahoma, state law prohibits a person from violating a protective order. 22 O.S. §60.6(A). By serving the protective order on Martinez and by Martinez's refusal to receive it or comply with the provisions of the protective order, Deputy Lee had probable cause to arrest and/or detain Martinez for violation of the protective order.

Finally, during the encounter as Deputy Lee attempted to arrest Martinez, Martinez assaulted and battered Deputy Lee in the form of striking, hitting and punching Deputy Lee as Lee attempted to arrest and subdue Martinez. Assault and Battery on a Police Officer is a crime in the State of Oklahoma. 21 O.S. §649; 650; *Cantrell v. State*, 561 P.2d 973 (Okla. Crim. App. 1977) (affirming conviction for Assault and Battery Upon a Police Officer when defendant struck the officer and rendered him momentarily unconscious). The same is true for Resisting a Peace Officer pursuant to 21 O.S. §268. E.g., *Reams v. State*, 551 P.2d 1168 (Okla. Crim. App. 1976) (finding that to sustain charge of resisting an officer in discharge of his official duty, it is necessary to show some act of aggression on the part of the accused from which court and jury can reasonably infer

---

[7] During the encounter, Isidra Mitchell and Maria Martinez likewise attempted to obstruct Deputy Lee. They both refused to provide Deputy Lee with his radio when requested, so he could summon help, and Isidra Mitchell touched or "was on top of" Lee during the encounter as she attempted to prevent Lee from arresting Martinez. (UF Nos. 25-27).

forcible resistance or interference). Based on the undisputed facts, following Martinez's immediate resistance and subsequent assault and battery of Lee, Lee had probable cause to arrest Martinez for Assault and Battery on a Police Officer and Resisting a Peace Officer.

Accordingly, for all these reasons, the §1983 Unlawful Detention/Arrest Claim is without merit.

### 2. Excessive Force

Plaintiff's Second Claim is one for excessive force. (Doc.2 at p. 11). Plaintiff claims that Lee used excessive force against Martinez during the arrest and subsequent shooting of Martinez. (*Id*. at ¶44-45). Excessive force cases are analyzed under an "objective reasonableness" standard. See *Graham v. Connor*, 490 U.S. 386, 388 (1989). Whether or not a use of force is reasonable requires balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8 (1985). Determining reasonableness "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

"This is an objective test, to be 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Withers v. City of Cleveland*, 640 Fed. Appx. 416, 419 (6th Cir. 2016) (quoting *Graham*, 490 U.S. at 396). "This standard contains a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). "Further, 'the calculus of reasonableness must embody allowance for the fact that police

officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006) (quoting *Graham*, 490 U.S. at 396-97); *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005).

If a particular use of force is considered deadly force, then an officer's use of that force is reasonable only "if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008); see *Garner*, 471 U.S. at 11 ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."); *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1313 (10th Cir. 2009).

Here, the undisputed facts demonstrate that Deputy Lee did not use excessive force during his encounter with Martinez. The record reveals Deputy Lee was forced – by Martinez's resistance – to make split-second decisions about how to deal with Martinez's aggressive conduct, fighting, assault/battery, threats, and life-threatening conduct. An analysis of the *Graham* factors in the context of the undisputed facts shows that Deputy Lee is entitled to qualified immunity.

**a. Severity of the Crimes**.

The severity of the crimes was substantial. Deputy Lee was serving a protective order for the purpose of ensuring two minor children were safe based on Chapa's allegations that Martinez was violent and had threated her. Upon Lee's attempt to serve the protective order, Martinez cursed and threatened Deputy Lee and his own family members. Martinez's family members agree that Martinez began jumping up and down; cursing; getting wild; throwing his arms in the air; and telling the deputy to get out of the house, or to "get the F out of the house" or "what the F are you

doing in my house, also pointing at his face, what the F are you doing in my house, get out of my house." (Doc. 50, at 5).

Martinez threatened Deputy Lee with bodily harm. Lee then attempted to arrest Martinez for making threats against him and his own family, but Martinez immediately resisted. Martinez struck Lee and punched him in the lower abdomen, groin, vest, and head area. Martinez and Lee engaged in a struggle, and Lee believed Martinez was lunging for a gun in the nightstand.

Ultimately, the fight moved to the back bedroom, where Lee was able to get a single handcuff on Martinez's wrist and tightened the cuff as a pain compliance technique. This did not result in compliance from Martinez. Martinez was able to get away from Lee's grip while Lee was on his knees, and Martinez began delivering punches to Lee's face, side of his head and underneath his chin (including using the handcuff as a weapon); threatened to kill Lee; and ultimately caused Lee to nearly black out and urinate on himself. Because of the verbal threat to Lee's life, and his position in the back bedroom, Lee was able to unholster his gun and shot Martinez one time in the chest while Martinez was standing over him in a crouched position.

In summary, Martinez had allegedly engaged in threatening conduct toward Chapa with a gun, resulting in a protective order; engaged in criminal conduct by uttering threats of violent acts and obstructing an officer; and ultimately engaged in assault and battery on a police officer, violently resisted arrest, and uttered threats to kill Deputy Lee. The severity of Martinez's criminal conduct was substantial. See *Coronado v. Olsen*, 2022 WL 152124, 4 (10th Cir. 2022) (unpublished) (threats against person/property were serious even though suspect charged with misdemeanors).

**b. Threat Level to Officer and Others**.

Even though Martinez also made threats to his mother, the primary threats were made by Martinez to Deputy Lee. These threats were imminent, physical, life-threatening, and out of proportion to Lee's attempt to serve a protective order. Martinez was not aware that Lee was also going to take protective custody of his children; rather, Martinez became aggressive, threatening and "wild" – throwing his arms in the air and cursing – immediately upon Deputy Lee's attempt to serve the protective order. The threat was immediate and, when Lee attempted to arrest him for the threats, he engaged in conduct that was threatening to Lee and anyone in the small confines of the hallway and bedrooms. *Estate of Larsen*, 511 F.3d at 1263 (stating that disregard of police commands and walking toward officers, while wielding a weapon, constituted hostile actions). Lee also believed that Martinez was lunging for a gun following Lee's attempt to arrest him, thereby increasing the threat level.[8]

The threat level increased as they continued to struggle into the back bedroom. During that time, Lee testified he felt further isolated by the conduct of Isidra Mitchell, as (1) she directly and intentionally interfered with Lee's attempt to arrest and subdue Martinez [9] and (2) failed to comply

---

[8] Lee was aware that Chapa stated that Martinez threatened her with a gun just two days prior. Deputy Lee's mistaken belief that he was lunging for a gun, or had one in the house, was reasonable. E.g., *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) ("Even if an officer reasonably, but mistakenly, believed that a suspect was likely to fight back ... the officer would be justified in using more force than in fact was needed . . . A reasonable officer need not await the "glint of steel" before taking self-protective action; by then, it is "often ... too late to take safety precautions."); *Crittenden v. City of Tahlequah*, 786 Fed. Appx. 795, 802 (10th Cir. 2019) (reasonable belief that suspect had weapon supported qualified immunity for officer in deadly force case); *In re Estate of Bleck v. City of Alamosa*, 643 Fed. Appx. 754 (10th Cir. 2016) (Gorsuch, J.) (officers reasonably believed suspect was intoxicated, volatile and very possibly armed).

[9] Plaintiff's own expert agreed that Ms. Mitchell's conduct was possibly illegal, if she was interfering or obstructing Lee's effort to make an arrest. (Exhibit 12, Depo. of Noble at 41:9-21).

17

with Lee's request to give him his radio so he could summon help. Instead, she refused to provide the radio to him. The conduct of Mitchell increased the threat level, as she prevented Lee from summoning additional assistance, and instead complied with Martinez's command that she refuse to give Lee the radio and, instead, record the incident. A reasonable officer would deem the threat level to be high when a suspect and his family member collude – during a hostile struggle – to prevent the officer from summoning back-up support.

Further, immediately prior to the shooting, the threat level in the back bedroom was high. Lee was able to get only one handcuff on Martinez as they continued to struggle. At the point when Martinez was able to escape Deputy Lee's grasp, the handcuff became a weapon.[10] Martinez continued to assault and batter Lee with hits to his body and face, causing Lee to nearly black out and to urinate on himself. He believed his life was in danger as Martinez had made threats against his life, and had assumed a position over him while assaulting him. It was at that point that Lee was able to unholster his weapon and shoot Martinez. Therefore, from the perspective of assessing the threat level, (1) Martinez was refusing to comply with police commands; (2) Martinez was making hostile and assaultive conduct with his hands and the single handcuff; (3) the distance separating Lee and Martinez was minimal (between 0 and 12 inches), as they were involved in a physical struggle; and (4) Martinez stated (and manifested) his intent to injure or kill Lee.[11]

---

[10] Plaintiff's expert agreed that the handcuff was a weapon in this circumstance. (Exhibit 12, Depo. of Noble at 71:1-4).

[11] These factors are considering in assessing the threat level to the officers. See *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008)); *Jiron v. City of Lakewood*, 392 F.3d 410, 414-14 (10th Cir. 2004); *Lennen v. City of Wyoming*, 2022 WL 612799 (10th Cir. 2022) (describing these as "four nonexclusive factors" in assessing threat posed by suspect). Other courts note that erratic behavior from the suspect (such as that exhibited by Martinez) weighs in the officer's favor, since a suspect's unpredictable behavior presents an increased threat. See *Wilson v. Parker*, 746 Fed. App. 860, 864 (11th Cir. 2018).

Case 4:20-cv-00598-TCK-SH   Document 72 Filed in USDC ND/OK on 09/21/22   Page 19 of 20

Finally, Plaintiff has alleged that Lee shot Martinez while Martinez was lying on his back, on the floor, with Lee on top of Martinez holding him down. That version of the facts has been proven – scientifically and mathematically – to be inaccurate. (UF Nos. 31-36). Plaintiff has no admissible evidence to controvert the scientific evidence presented in Matthew Noedel's expert report. (Exhibit 21). This undisputed fact further shows that the threat level was substantial.

**c. Actively Resisting Arrest**.

The third *Graham* factor assesses whether the suspect was actively resisting arrest. Martinez was actively resisting arrest, and was engaged in violent and assaultive conduct toward Lee. Immediately before the shooting, Martinez had gained the upper hand, was assaulting and hitting Lee, who blacked out and urinated on himself. This was more than a "threat" of serious physical harm to an officer caused by Martinez's active resistance.

A reasonable officer in Lee's position would have probable cause to believe that there was a serious threat of physical harm to himself in this situation. The severity of the crimes at issue was substantial; the threat level to Deputy Lee was high; and Martinez was actively resisting arrest, including using the single handcuff as a weapon. Further, Martinez's family members were isolating Deputy Lee in the house so Martinez could cause further harm to Lee. Isidra Mitchell was repeatedly "tapping" or touching Lee's back in an attempt to prevent the arrest, and also prevented Lee from using his radio, thereby actively preventing Lee from summoning help. Martinez's sister also refused to provide Lee with his radio, when requested. In summary, all three of the *Graham* factors indicate that Lee's use of deadly force was objectively reasonable. Lee's "split-second judgment" to use deadly force in a situation that was "tense, uncertain, and rapidly

evolving" was reasonable. *Crittenden v. City of Tahlequah*, 786 Fed. Appx. 795, 802 (10th Cir. 2019).[12]

### IV. Municipal Liability

"A municipality may not be held liable for the actions of its employees if those actions do not constitute a violation of plaintiff's constitutional rights." *Livsey v. Salt Lake County*, 275 F.3d 952, 958 (10th Cir. 2001); see also *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1154 (10th Cir. 2001); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Apodaca v. Rio Arriba County Sheriff's Dept.*, 905 F.2d 1445, 1447-48 (10th Cir. 1990); *Watson v. City of Kansas City*, 857 F.2d 690, 697 (10th Cir. 1988). Because the Court finds Deputy Lee did not violate Martinez's constitutional rights, Rogers County cannot be held liable under § 1983 and is entitled to summary judgment. (See Doc.50).

### V. CONCLUSION

For the reasons stated above, Deputy Lee is entitled to qualified immunity. Lee did not violate Martinez's constitutional rights, but instead, was required to make split-second decisions in response to Martinez's violent and assaultive conduct. Further, because a municipality cannot be held liable if the actions of its employee do not amount to a constitutional violation, Rogers County is entitled to summary judgment.

Accordingly, Defendants' Motions for Summary Judgment are granted. (Docs. 50, 51).

**IT IS SO ORDERED this 21st day of September, 2022.**

TERENCE C. KERN
United States District Judge

---

[12] Based on the Court's analysis Plaintiff's alternative arguments are without merit. Additionally, Plaintiff abandoned the third claim for relief, denial of medical care, in the Response. (Doc. 57).